# SEALED

FILED
2020 SEP 3 PM 2:44
CLERK
U.S. DISTRICT COURT

Christopher B. Snow (#8858)
Shaunda L. McNeill (#14468)
**CLYDE SNOW & SESSIONS**
201 South Main Street, 13th Floor
Salt Lake City, Utah 84111-2516
Telephone: 801.322.2516
cbs@clydesnow.com
slm@clydesnow.com
*Attorneys for Relator*

---

## IN THE U.S. DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel., TRACY VALEIKAS, <br><br> Plaintiff, <br><br> v. <br><br> COTTONWOOD HEALTHCARE, LLC, a Utah limited liability company; and CRESTWOOD REHABILITATION AND NURSING, LLC, a Utah limited liability company, <br><br> Defendants. | **SEALED COMPLAINT** <br><br> **(Filed in camera and under seal pursuant to 31 U.S.C. § 3730(b)(2))** <br><br> **Jury Trial Demanded** <br><br> Case No.    **Case: 2:20−cv−00619** <br> **Assigned To : Nielson, Howard C., Jr** <br> Judge    **Assign. Date : 9/3/2020** <br> **Description: USA ex rel Valeikas** |

---

Plaintiff hereby complains against Defendants Cottonwood Healthcare, LLC and

Crestwood Rehabilitation and Nursing, LLC under the False Claims Act and alleges as follows:

### PARTIES

1.      Plaintiff-Relator Tracy Valeikas is a citizen of the State of Utah ("Relator"). She

brings this action on behalf of the United States of America.

2.      Defendant Cottonwood Healthcare, LLC ("Cottonwood"), is a Utah limited

liability company.

3.      Crestwood Rehabilitation and Nursing, LLC ("Crestwood"), is a Utah limited

liability company. On information and belief, Cottonwood is the parent company of Crestwood.

## JURISDICTION AND VENUE

4.      Jurisdiction is founded on the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq.

The FCA provides that the U.S. District Courts have jurisdiction over all actions brought under

the FCA.

5.      Venue is proper in the District of Utah pursuant to 31 U.S.C. § 3732(a) because

Defendant is found, resides, and transacts business in this District, and because the Nursing

Home Reform Act violations took place in this District.

6.      This Court has personal jurisdiction over Defendants because they are Utah

limited liability companies with their principal places of business in the District of Utah.

## BACKGROUND FACTS

7.      Cottonwood directly or indirectly owns and operates the following skilled nursing

facilities or nursing homes in Utah:

Crestwood Rehabilitation & Nursing (owned through Defendant Crestwood)
3665 Brinker Avenue
Ogden, Utah 84403
88 dually certified Medicare/Medicaid beds

Alpine Meadow Rehabilitation & Nursing
2520 South Redwood Road
West Valley City, Utah 84119
26 certified Medicaid beds

Little Cottonwood Rehabilitation & Nursing, LLC
3094 South State Street
Salt Lake City, Utah 84115
37 certified Medicaid beds

Lomond Peak Nursing and Rehabilitation, LLC
524 East 800 North
Ogden, Utah 84404
74 certified Medicaid beds

Millcreek Rehabilitation & Nursing
3520 South Highland Drive
Salt Lake City, Utah 84106
61 dually certified Medicare/Medicaid beds

Spanish Fork Rehabilitation & Nursing
151 East Center Street
Spanish Fork, Utah 84660
29 dually certified Medicare/Medicaid beds[1]

## Overview of Relator's Employment at Crestwood

8.      Relator was employed as a registered nurse at Crestwood from the fall of 2017 to April 26, 2019.

9.      Her duties included direct patient care, administration of medications, charting, supervising other staff members, and serving as charge nurse. For a brief period, she also worked as the MDS (minimum data set) Coordinator, which involved preparing patient assessments and other reports that were submitted to the U.S. Government and used to set Medicare and Medicaid reimbursement rates.

10.     During her employment at Crestwood, Relator personally witnessed fraudulent practices adopted by Cottonwood and Crestwood to improperly maximize their profits at the expense of the U.S. Government.

11.     The wrongful practices and false claims intensified in or around July of 2018 under Ethan Fey, the new administrator at Crestwood, who was charged with increasing

---

[1] Source for certified bed counts:
http://health.utah.gov/hflcra/facinfo/Fac_export_Mar_11_2020.htm

profitability, even if it required severely compromising resident care and submitting false billing statements to the government.

12.    Following Mr. Fey's appointment, the Director of Nursing, C.D.,[2] began maternity leave. During the maternity leave, the Assistant Director of Nursing, A.V., and MDS Coordinator, H.F., shared the Director of Nursing responsibilities and also retained their own respective job duties. Also during the maternity leave, a number of corporate changes were made, which were unwelcome by the nursing administrations because they had a negative impact on patient care.

13.    Shortly after the Director of Nursing returned from maternity leave, the MDS Coordinator resigned, and the Relator was offered the MDS Coordinator position. While Relator was training for the MDS Coordinator position, she attended meetings in which Ethan Fey directed staff to cut corners in unethical and illegal ways in order to increase profits.

14.    The Director of Nursing, who was highly respected, had numerous discussions with Mr. Fey and with corporate regarding her concerns with the budget cuts and corporate policies and their negative impact on patient care. After her attempts to improve patient care failed, the Director of Nursing resigned because of the deplorable resident care being provided (or not provided) under Mr. Fey's leadership. In an attempt to convince the Director of Nursing to withdraw her resignation, Defendants offered her a substantial raise, to which she responded to the effect of, "If you can offer me a raise, why can't I have the money for patient care?"

15.    Following the Director of Nursing's resignation, the Assistant Director of Nursing also resigned in protest of the poor resident care. A new Director of Nursing, K.E., was hired.

_____

[2] For confidentiality reasons, residents and lower-level employees are referred to by their initials. Relator is able to provide the names.

Around the same time, Mr. Fey forced the Medical Director, M.W., and the Nurse Practitioner,

L.M.C., to resign because of their opposition to the deplorable resident care.

**Relator's Observations during MDS Coordinator Training**

16.     Crestwood bills Medicare and Medicaid on a flat-fee basis for each of its

residents. Invoices are sent monthly.

17.     Every certified Medicare or Medicaid nursing home is required by federal law to

perform MDS assessments of its residents. The MDS process requires a comprehensive,

standardized assessment of each resident's functional capabilities and health needs. Assessments

are conducted by trained nursing home clinicians on all patients at admission and discharge, in

addition to other time intervals (e.g., quarterly, annually, and when residents experience a

significant change in status).

18.     Critically, the MDS assessment is used to determine the level of care required by

each resident and the corresponding Medicare and Medicaid reimbursement rate for that level of

care.

19.     During the period Relator was trained to be the new MDS Coordinator,

Crestwood's administrator, Mr. Fey, instructed her to falsely state in the MDS assessments

(1) that residents required more care than they actually required and (2) that residents received

more care than they actually received.

20.     For example, for Medicare or Medicaid resident, L.N. (Room 101) who was able

to ambulate without assistance, Mr. Fey instructed Relator to falsely state that the resident

required a one-person assist to ambulate so that Crestwood could submit the false statement to

the U.S. Government and receive reimbursements at the higher rate.

21.     As another example, Medicare or Medicaid residents P.A. and E.T. required a two-person assist to transfer into a wheelchair for mobility and into the shower chair for bathing. However, Crestwood only provided a one-person assist for these purposes. Mr. Fey nonetheless instructed Relator to falsely state that they were being provided a two-person assist so that Crestwood could submit the false statement to the U.S. Government and receive reimbursements at the higher rate.

22.     As another example, numerous residents, including P.A. and E.T., required diabetic meals, and their MDS assessment reflected that they were receiving diabetic meals, which corresponded with an increased reimbursement rate from Medicare and Medicaid. However, Relator was aware first hand from her work as a nurse and additionally from express statements to that effect by the new Director of Nursing, K.E., that Crestwood routinely failed to provide diabetic meals to residents. The only time Relator observed diabetic meals being provided was when state inspectors were on the premises.

23.     In reviewing the MDS assessments previously submitted to Medicaid and Medicare and those she was instructed to work on, Relator observed systemic, intentional false statements as to the level of care required by and received by the residents at Crestwood for express purpose of fraudulently increasing government reimbursement rates.

24.     Because she was unwilling to falsify MDS assessments used to bill Medicare and Medicaid, Relator returned to her position as a nurse. In her place, Crestwood hired another individual who was willing to falsify the MDS assessments so that Crestwood could continue submitting false bills to Medicare and Medicaid.

25.     Throughout her time at Crestwood but especially beginning in or around July 2018, Relator also observed woefully deficient, inadequate, and substandard medical care and other services and even the withholding of necessary medical care and other services from Crestwood residents for whom Crestwood was billing Medicare and Medicaid on a monthly, flat-fee basis.

26.     Cottonwood and Crestwood knew their conduct violated Medicare and Medicaid guidelines. However, they continued their pattern of malfeasance to wrongfully maximize their profits.

## REGULATORY FRAMEWORK

27.     Statutes and regulations governing the Medicare and Medicaid programs require health care providers like Defendants to maintain full compliance with all the rules and regulations governing the programs as a pre-requisite to receiving payment under the programs. Moreover, providers cannot submit claims for services that are "of a quality which fails to meet professionally recognized standards of health care." 42 U.S.C. § 1320c-5(a)(2); see also 42 U.S.C. § 1320a-7b(a)(1)(3) (criminal penalties for submitting claims when provider knows it has no continued right to receive payment); 42 U.S.C. § 1320a-7(b)(6)(B) (provider can be excluded from participation in Medicare for submitting claims for inadequate care).

28.     Congress, in the Omnibus Budget Reconciliation Act of 1987, enacted the Nursing Home Reform Act, 42 U.S.C. § 1396r et seq., which took effect on October 1, 1990. A nursing facility is defined in the Nursing Home Reform Act as "an institution . . . which—

(1) is primarily engaged in providing to residents--

(A) skilled nursing care and related services for residents who require medical or nursing care,

(B) rehabilitation services for the rehabilitation of injured, disabled, or sick persons, or

(C) on a regular basis, health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities, and is not primarily for the care and treatment of mental diseases; . . .

42 U.S.C. § 1396r(a).

29.     The Nursing Home Reform Act mandates that nursing facilities comply with federal requirements relating to the provision of services. 42 U.S.C. § 1396r(b). Specifically, in terms of the quality of life for residents of nursing facilities, "[a] nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident." 42 U.S.C. § 1396r(b)(1)(A). "A nursing facility must operate and provide services in compliance with all applicable Federal, State and local laws and regulations ... and with accepted professional standards and principles which apply to professionals providing services in such a facility." 42 U.S.C. § 1396r(d)(4)(A); *see also* 42 U.S.C. § 1396r(b)(4)(A)(vii) ("The services provided or arranged by the facility must meet professional standards of quality.")

30.     Additionally, nursing facilities like those operated by Defendants must "provide services and activities to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident in accordance with a written plan of care which–

(A) describes the medical, nursing, and psychosocial needs of the resident and how such needs will be met.

42 U.S.C. § 1396r(b)(2)(A).

42.     Defendants, operating as a as nursing facility, must fulfill the residents' care plans by, among other things, providing of nursing and related services and medically-related social

services that attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident; pharmaceutical services to meet the needs of each resident; dietary services that meet the daily nutritional and special dietary needs of each resident; and dental services to meet the needs of each resident. 42 U.S.C. § 1396r(b)(4)(A)(i-vi).

43.     The Social Security Act mandates that skilled nursing facilities that participate in the Medicare Program and nursing facilities that participate in the Medicaid Program, meet certain specific requirements in order to qualify for participation and receive tax-payer dollars from these programs. These requirements "serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid." 42 C.F.R. § 483.1 (b).

44.     Federal regulations provide, "Quality of care is a fundamental principle that applies to all treatment and care provided to facility residents. Based on the comprehensive assessment of a resident, the facility must ensure that residents receive treatment and care in accordance with professional standards of practice, the comprehensive person-centered care plan, and the resident's choices." 42 C.F.R. § 483.25. The Federal regulations contain specification requirements with respect to several quality of care issues:

> **Pressure ulcers**. Based on the comprehensive assessment of a resident, the facility must ensure that -
>
> (i) A resident receives care, consistent with professional standards of practice, to prevent pressure ulcers and does not develop pressure ulcers unless the individual's clinical condition demonstrates that they were unavoidable; and
>
> (ii) A resident with pressure ulcers receives necessary treatment and services, consistent with professional standards of practice, to promote healing, prevent infection and prevent new ulcers from developing.

42 C.F.R. § 483.25(b)(1).

> **Foot care**. To ensure that residents receive proper treatment and care to maintain mobility and good foot health, the facility must -
> (i) Provide foot care and treatment, in accordance with professional standards of practice, including to prevent complications from the resident's medical condition(s) and
> (ii) If necessary, assist the resident in making appointments with a qualified person, and arranging for transportation to and from such appointments.

*Id.* at § 483.25(b)(2).

> **Accidents**. The facility must ensure that -
>
> (1) The resident environment remains as free of accident hazards as is possible; and
>
> (2) Each resident receives adequate supervision and assistance devices to prevent accidents.

*Id.* at § 483.25(d).

> **Incontinence**.
>
> (1) The facility must ensure that a resident who is continent of bladder and bowel on admission receives services and assistance to maintain continence unless his or her clinical condition is or becomes such that continence is not possible to maintain.
>
> (2) For a resident with urinary incontinence, based on the resident's comprehensive assessment, the facility must ensure that -
>
> > (i) A resident who enters the facility without an indwelling catheter is not catheterized unless the resident's clinical condition demonstrates that catheterization was necessary;
> >
> > (ii) A resident who enters the facility with an indwelling catheter or subsequently receives one is assessed for removal of the catheter as soon as possible unless the resident's clinical condition demonstrates that catheterization is necessary, and
> >
> > (iii) A resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore continence to the extent possible.

*Id.* at § 483.25(e).

> **Assisted nutrition and hydration**. . . . Based on a resident's comprehensive assessment, the facility must ensure that a resident . . .
>
> (3) Is offered a therapeutic diet when there is a nutritional problem and the health care provider orders a therapeutic diet. . . .
>
> (5) A resident who is fed by enteral means receives the appropriate treatment and services to restore, if possible, oral eating skills and to prevent complications of enteral feeding including but not limited to aspiration pneumonia, diarrhea, vomiting, dehydration, metabolic abnormalities, and nasal-pharyngeal ulcers.

*Id.* at § 483.25(g).

> **Pain management**. The facility must ensure that pain management is provided to residents who require such services, consistent with professional standards of practice, the comprehensive person-centered care plan, and the residents' goals and preferences.

*Id.* at § 483.25(k).

45.    There must be adequate nursing staff with the appropriate competencies and skill sets to provide nursing care to all residents in accordance with resident care plans. 42 C.F.R. § 483.35.

46.    "The facility must provide routine and emergency drugs and biologicals to its residents." 42 C.F.R. § 483.45.

47.    The facility must "[A]ll drugs and biologicals in locked compartments under proper temperature controls, and permit only authorized personnel to have access to the keys." 42 C.F.R. § 483.45(h)(1).

48.    The Nursing Home Reform Act also mandates that "the State shall be responsible for certifying . . . the compliance of nursing facilities (other than facilities of the State)" with federal requirements." 42 U.S.C. § 1396r(g)(1)(A).

## THE CONTRACTUAL PROMISES MADE BY DEFENDANTS

49.     Defendants own and operate licensed long-term care nursing facilities, including

Crestwood, under federal and state law and are certified to participate in the Medicare and

Medicaid programs.

50.     At all times relevant to this action, Defendants were "providers" with contractual

agreements with the U.S. and its agents.

51.     Defendants expressly and impliedly certified to the U.S. and its agents that they

would comply with all statutes and regulations applicable to skilled nursing facilities and nursing

homes. However, Defendants knowingly and willfully failed to comply with these statutes and

regulations.

52.     Defendants submitted false or fraudulent claims to the U.S. Government for

payment regarding vulnerable residents at Crestwood and other facilities owned and operated by

Cottonwood.

53.     The claims were false or fraudulent because of Defendants' express

misrepresentations regarding MDS assessments and regarding the level and nature of care being

provided.

54.     The claims were also false or fraudulent because of Defendants' knowing, willful,

gross, material, noncompliance with governing federal and state statutes and regulations, which

has resulted and is continuing to result in serious patient harm.

### DEFENDANTS' PROVISION OF NONCOMPLIANT, WORTHLESS, AND NONEXISTENT SERVICES FOR WHICH IT BILLED MEDICARE AND MEDICAID

55.     During her employment with Crestwood, Relator observed numerous instances of

noncompliant, worthless, and even nonexistent services for which Crestwood has billed

Medicaid and Medicare. Relator's observations pertain to the lower level of the Crestwood facility, where the patients on Medicare and Medicaid reside.

56.     **Failure to Provide Adequate Nursing Staff**. Crestwood typically assigns one nurse to approximately 30 patients on the lower level of its facility, where long-term, high-need patients on Medicare and Medicaid reside. The upper floor, which houses a lesser number of rehabilitation patients having lower acuity than the first level patients, is staffed with two nurses. The upstairs patients are predominately on private insurance. Nurses on the upper level are not willing or required to assist those on the lower level.

57.     **Lack of Medical Care and Attention**. Crestwood is grossly negligent in its care and monitoring of residents.

   a.   Residents regularly get bed sores because no one turns them in bed. For example, in 2018 alone, the residents in Room 114-2 (B.), Room 105-2 (C.P.), Room 106-3 (N.), Room 107-3 (L.Y.), Room 109-1&2 (H.K. & Y.O.), Room 112-1 (Y.H.), and Room 113-1 (E.T.) developed bed sores because they were not properly turned.

   b.   Residents frequently fall because no one transfers them or helps them ambulate, or because the assistance is provided in a grossly negligent manner due to lack of proper training by Crestwood. These falls are typically not documented. For example, in or around August or September of 2018, Medicare or Medicaid resident, V.A., experienced multiple falls. The resident needed assistance to use the toilet every two hours, and because Crestwood staff did not provide assistance every two hours, the resident would often fall trying to get to the toilet on his

own. As another example, during roughly the same time period, Medicare or
Medicaid resident H.K. required a 2-3 person assist to be transferred to her
wheelchair or shower chair. Because not enough staff were made available to
assist with the transfers, and because the staff were not properly trained and did
not have proper equipment, falls occurred frequently. Many of these falls were
never documented.

c.   Residents frequently soil themselves because no one is available to take them to
the bathroom. Exhibit A shows an example of a Medicaid resident, S.M., who was
competent and verbal but who wet herself because no one assisted her to the
toilet. The photo was taken by Relator on July 31, 2018.

d.   High-risk residents are not monitored. For example, on November 4, 2019,
Medicare patient, Y.H., on a feeding tube aspirated in the middle of the night.
Sometime later in the night, a CNA saw that the patient had vomited and reported
this to the upstairs nurse. (There was no downstairs nurse in the building at the
time.) However, the upstairs nurse did not check on the patient. The next morning
when Relator came on shift, Relator found the patient in distress, lying flat on her
back with the feeding tube and with vomit around her head, neck, and back.
Relator immediately sent the patient to the emergency room, where she died from
complications from aspiration. Relator documented the incident in the patient's
electronic chart, but her documentation was altered by Crestwood, and the
incident was never reported to authorities.

58.    **Failure to Provide Adequate Nutrition**. Crestwood fails to provide food of sufficient quantity and quality to its patients. The budget for patient nutrition was $2.80 per day per resident. At times during the spring of 2018, Relator observed that Crestwood served only celery and water to patients for dinner. In the latter part of 2018 and early 2019, Relator frequently observed that Crestwood served only lettuce with dressing for dinner.

59.    **Failure to Provide Diabetic Meals**. Crestwood fails to provide diabetic residents with meals appropriate to their medical condition and instead feeds them the same food as all other residents. Crestwood was cited for this problem by state inspectors and in the past and in mid-2018 began falsifying kitchen records to indicate that diabetic meals were being provided even though they were not. The only time Relator observed diabetic meals actually being provided was when inspectors were present.

60.    **Grossly Negligent Administration of Feeding Tubes**.

   a.    Crestwood staff regularly failed to elevate patient beds when administering feeding tubes. To avoid aspiration, patient beds must be elevated to 30 degrees when residents are being fed through a feeding tube. This failure to elevate was the cause of the fatal aspiration of resident Y.H. referred to above.

   b.    Crestwood fails to obtain adequate quantities of nutritional bags to be administered by feeding tube. Crestwood therefore substitutes whatever liquids are on hand, such as off-the-shelf supplements like Ensure, contrary to patient care plans, doctor's orders, and standards of care.

   c.    Crestwood often provides solid food to residents for whom feeding tubes have been prescribed. Exhibit B shows a meal prepared by the kitchen for resident Y.H., who

had been prescribed a feeding tube. The instructions with the meal incorrectly state that the patient is on a standard pureed diet and that she can eat bread. The photo was taken by Relator on March 12, 2017.

    d.  In the fall of 2018, Relator observed the Director of Nursing change a doctor's order regarding the quantity of food to be administered to resident Y.H. through a feeding tube.

61.  **Failure to Procure and Administer Prescribed Medications**.

    a.  Crestwood regularly runs out of prescribed patient medications because it does not stay current on its pharmacy bills and also fails to submit medication orders in a timely manner (sometimes due in part to non-functioning fax machines).

    b.  Due to the unavailability of medications, Crestwood's staff will borrow medication from one patient to give to another patient. However, in addition to this being dangerous and unethical, the patient from whom the medication was borrowed then runs out of medication before the appropriate refill interval. Exhibit C shows boxes of insulin with the first names of diabetic patients written on the inside of the boxes. In the first picture, one of the boxes is empty. In the second picture, three boxes are empty, and there is one unopened box. In both cases, standard practice at Crestwood, as observed by Relator, would be for the nurses to share the available insulin among all diabetic patients. These pictures were taken by Relator on December 17, 2018, and April 21, 2019.

62.  **Failure to Provide Prescribed Physical Therapy**. Many Crestwood patients are prescribed physical therapy, which is indicated in their MDS assessments for purposes of determining the reimbursement rate applicable to the resident. The physical therapy rarely to

never occurs but is nonetheless charted and billed to the government. For example, resident J.G. and T.S. were each ordered to receive regular physical therapy in 2018 and 2019, and were documented to have received physical therapy on numerous occasions, but they did not receive it. A former Crestwood physical therapist, K._., was fired because he refused to report anything other than the actual time he spent providing therapy to residents.

63.    **Failure to Provide Adequate Wound Care and Foot Care**.

a.    Crestwood neglects the wound care needs of its Medicare and Medicaid patients. Although Crestwood designated a nurse as the wound care nurse, this nurse spends her time upstairs with the private insurance and self-pay patients and neglects the Medicare and Medicaid patients.

b.    For example, on March 8, 2018, an aide asked Relator to come into the room of a Medicare/Medicaid resident, L.Y., because there was a putrid smell coming from under a tight, wet Coban wrap. The patient was purportedly under the care of the wound nurse, but because of the putrid smell, Relator unwrapped the wound herself and found a rotting ulcer, as shown in Exhibit D. The wound appeared not to have received any attention for several days. The skin under the bandage was wet, as the man had been bathed with the wrap on. He had to be sent to another facility for specialized wound care at great public expense.

64.    **Failure to Bathe**. Residents are not bathed regularly. For example, Medicaid residents P.A., H.K., S._, and E.T. were rated on their MDS assessments as requiring a two-person assist for bathing, but they rarely to never received baths or showers at all. Medicare resident J.K. was rated as a one-person assist but rarely to never received baths or showers either.

65. **Residents Left Lying in Excrement.** Residents are sometimes left lying in their own excrement for many hours. For example, Medicare/Medicaid residents S.C. (Room 112-2), L.Y. (Room 107-3), N._. (Room 106-2), H.K. (Room 109-3), Y.O. (Room 109-2), L.G. (Room 103-3), and T.S. (Room 115-1) were each left lying in their own excrement for long periods of time on dates beginning in July 2018.

66. **Failure to Maintain Sanitary Conditions.** Residents are allowed to hoard food in their rooms for days and weeks at a time. For example, for long periods of time during the second half of 2018 and the first quarter of 2019, the room of Medicare/Medicaid residents J.K. (Room 113-1), E.T. (Room 113-2) C.M. (Room 116-1) and R.M. (Room 116-3), had a strong odor of rotting food that emanated out of the room to the nearby dining area.

67. **Unsafe Administration of Laxatives**. In or around May or June of 2018, the new Director of Nursing under Mr. Fey changed the Medical Director's Standing Order to require milk of magnesia (a laxative) to be administered to residents during every shift until the resident had a bowel movement. This protocol was not approved by the Medical Director and was applied to patients who had separate bowel regimens involving other laxatives. Shortly after Relator's employment ended on April 26, 2019, Relator was at McKay-Dee hospital in the course of her new employment when a Medicare or Medicaid resident, H.K., arrived from Crestwood. The patient had been given too many laxatives by Crestwood staff and died as a result.

68. **Failure to Properly Dispose of Syringes**. Relator frequently observed syringes and blood that were not disposed of and that were left on counters, carts, and other surfaces within the reach of residents.

69.     **Failure to Secure Medical Supplies, including Sharp Objects**. Medical supply closets and cabinets were often left open and unattended, allowing anyone access to medical supplies, including sharp objects. Exhibit E shows examples of how Relator often found the supply closets and cabinets. The picture was taken by Relator on July 1, 2018.

70.     **Failure to Ban Illegal Drugs and Weapons**. Relator observed that a private-pay patient, R.P., was allowed to bring illegal drugs, guns, and, in one instance, a samurai sword to the facility. Crestwood looked the other way when private-pay patient physically assaulted Medicare and Medicaid patients on numerous occasions in 2018 because, as a private-pay patient, R.P. was so profitable to Crestwood and Cottonwood. Relator reported to Crestwood's administration that this resident had a gun, but her report was ignored.

71.     **Failure to Procure and Maintain Equipment**. Crestwood's administration failed to maintain functioning printers, fax machines, and other equipment. These devices were essential to the ability of Crestwood staff to communicate with physicians and pharmacists regarding patient care order and medication prescriptions. Their malfunction resulted in numerous delays in receiving orders for emergency care and receiving patient medications from pharmacies, among other things.

72.     **Unsafe Elevators**. Crestwood's elevator often requires a manual restart, which involves turning off the electric supply to the elevator and then turning it back on. Residents have been trapped in the elevator countless times. The fire department has been called several times, but eventually the building's maintenance and medical staff were trained on how to do the manual restart. Crestwood and Cottonwood has refused to pay for the elevator to be fixed or replaced despite the danger to residents.

73.    **Failure to Procure Sufficient Supplies**. Beginning with Mr. Fey's appointment as administrator in or around July of 2018, Crestwood failed to procure adequate amounts of basic supplies, such as laundry detergent and bandages. As a result, Relator and other staff members personally purchased laundry detergent, bandages, and other basic supplies for Crestwood on numerous occasions without being reimbursed.

74.    **Failure to Change Catheters**. Per physician orders and to avoid infection, catheters must be changed at least monthly. At Crestwood, catheters were rarely to never changed, resulting in frequent urinary tract infections.

75.    **Failure to Provide Oral Hygiene**. Crestwood rarely to never brushed residents' teeth or cleaned residents' dentures. The extent of oral hygiene at Crestwood was that aides took a Dentip oral swab, dipped it in Scope, put it in the resident's mouth, and told the resident to suck on it. Exhibit F shows an example of dentures that had not been cleaned for several weeks or months. The picture was taken by Relator on February 22, 2019.

76.    The deplorable patient care at Crestwood was not limited to one staff member or one area of service. Rather, there was a consistent pattern of neglect and utter disregard for the well-being of residents for whom Crestwood submits false MDS assessments and corresponding invoices to Medicare and Medicaid.

77.    Relator has recently spoken with current staff members at Crestwood who reported that the conditions have only deteriorated since Relator's departure in April of 2019.

78.    Relator has reason to believe that the issues she observed at Crestwood are systemic within all of the Cottonwood facilities. The problems are the result of corporate policies and management—namely, the overarching policy to refuse to pay for necessary staffing,

training, equipment, and supplies. Crestwood's administrator, Mr. Fey, indicated numerous times to Relator that his hands were tied because he was working within a limited budget set by "corporate," i.e. Cottonwood.

79.    Relator has also spoken with nurses at other of Cottonwood facilities, who confirm that they have observed the same grossly deficient conditions at the facilities where they worked.

## DEFENDANTS' KNOWING SUBMISSION OF FALSE AND FRAUDULENT CLAIMS

### Personnel Protests

80.    Through many sources of information, Defendants had knowledge within the meaning of 31 U.S.C. § 3729(b)(1)-(3) that their Medicare and Medicaid claims were false or fraudulent.

81.    C.D., Crestwood's former Director of Nursing, and A.V., Crestwood's former Assistant Director of Nursing, resigned from Crestwood in or around 2018 due to the deplorable patient care standards at Crestwood, which failed to conform to federal and state requirements. Despite C.D.'s leadership position, she was not able to remedy the patient care deficiencies because inadequate staffing, inadequate training resources, and the unavailability of necessary medications, supplies, and equipment were outside of her control. She regularly protested to administration, but her protests were ignored.

82.    Relator also protested to the new Director of Nursing and to administration about the patient care problems detailed above. For example, Relator met with Mr. Fey and K.T. (Crestwood business office manager) on September 25, 2018 to request additional staff and to inform them about the poor patient care. Mr. Fey responded by telling Relator she is an excellent

nurse and that he is doing the best he can with limited resources. He mentioned that Crestwood had more resources and better staffing than most of Cottonwood's nursing homes.

83.     Relator confronted Mr. Fey with her staffing and patient care concerns in another in-person meeting on February 17, 2019. She submitted a written grievance to K.T. on the same day.

84.     On April 21, 2019, Relator submitted another written grievance to Mr. Fey and K.T. Relator also reported her concerns to State regulators.

85.     Because she was becoming increasingly insistent that Crestwood address the serious staffing and patient care concerns she raised – and because she reported her concerns to state regulators – Crestwood terminated Relator' employment on April 26, 2019.

## Citations

86.     Nursing homes are periodically inspected by the Bureau of Health Facility Licensing and Certification on behalf of the U.S. Department of Health and Human Services to ensure compliance with the regulations discussed above. As discussed above, a facility that is not in compliance with the programs' rules and regulations is not eligible to provide services to Medicare or Medicaid beneficiaries and may be subject to sanctions. See generally 42 C.F.R. § 489.3; 42 U.S.C. § 1395i, and 42 C.F.R. § 488.408.

87.     Crestwood has been cited by regulators for several of the patient care problems identified above.

88.     For example, on March 26, 2018, even before Mr. Fey's appointment, Crestwood was fined $20,646 and cited for failing to provide catheter care in accordance with physician orders, failing to properly care for residents on feeding tubes, failing to manage resident pain,

failing to procure prescribed medications for patients, failing to provide palatable meals, failing to provide food in accordance with resident food allergies, among many other violations.

89.     Cottonwood's other facilities have also been cited for serious violations. Lomond Peak was closed by the State for a period of time due to its noncompliance with applicable state and federal requirements.

90.     Many of Crestwood's more serious violations identified above were not cited because Crestwood was aware of inspections in advance and would instruct staff to temporarily bring the facility into compliance to the extent possible on short notice. They would provide proper meals (including diabetic meals), increase staffing, obtain medications and supplies and secure them in locked cabinets, and otherwise attempt to give the false appearance of a compliant facility. Furthermore, the conditions at Crestwood deteriorated severely following Mr. Fey's appointment in or around July 2018.

91.     In addition, many of Crestwood's more serious violations identified above were not cited because Crestwood affirmatively altered patient records to hide serious violations and failed to report them to authorities. The death of Y.H. due to negligent administration of a feeding tube and failure to monitor is an example. (*See supra* ¶ 57.d.)

92.     Defendants entered provider agreements with Medicaid and Medicare and/or their designees. These contracts include a certification that the services billed were medically indicated and were actually rendered to the patients.

93.     Defendants have billed Medicare and Medicaid for each and every one of the Crestwood residents who received the noncompliant, worthless, and nonexistent services described herein.

94.     Defendants' expressly and impliedly certified to the U.S. Government that they were in compliance with the contracts, statutes, and regulations set forth herein, among others.

95.      By failing to perform the minimum necessary care activities for which Defendants billed the U.S. Government and by making express and implied misrepresentations regarding these failures, Crestwood has defrauded the U.S. Government.

## COUNT I

## VIOLATION OF THE FALSE CLAIMS ACT

96.     The allegations in the foregoing paragraphs are incorporated herein by reference.

97.     This is a claim to recover damages and civil penalties for false or fraudulent claims presented or caused to be presented by Cottonwood and Crestwood to the U.S. Government.

98.     As set forth in this Complaint, Relator has material evidence and information that supports Defendants' practice of knowingly presenting or causing to be presented to officers or employees of the U.S. Government false or fraudulent claims for payment or approval and knowingly making, using, or causing to be made false records or statements in order to secure payment from or approval of false or fraudulent claims by the U.S. Government. Relator's evidence includes her personal and direct knowledge, the testimony of others, and documents and photographs verifying violations of the FCA.

99.     None of the allegations in this Complaint are based upon public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional or General Accounting Office report, hearing, audit, or investigation, or from the news media.

100.     The U.S. Government paid excess monies to Cottonwood and Crestwood based upon Defendants' false reports, false claims, and fraudulent billing practices as set forth herein.

101.     On behalf of the U.S. Government, Relator requests that the Court enter judgment against Cottonwood and Crestwood for violations of the FCA equal to three times the amount of damages the U.S. Government has sustained because of Defendants' actions, plus civil penalties as provided under the FCA.

102.     Relator requests that she be awarded the maximum amount allowed pursuant to the FCA for her role as a Relator, and that she be awarded her attorney fees and costs, as well as any other allowable and appropriate relief.

### COUNT II

### RETALIATION AGAINST RELATOR
### IN VIOLATION OF THE FALSE CLAIMS ACT

103.     The allegations in the foregoing paragraphs are incorporated herein by reference.

104.     As set forth in paragraphs 82-85, Crestwood retaliated against Relator by terminating her employment based on Relator's complaints regarding and opposition to Crestwood's deplorable patient care and false Medicare and Medicaid claims.

105.     The retaliatory termination of Relator's employment was willful and intentional and with reckless indifference to Relator's protected rights.

106.     Relator is entitled to two times the amount of back pay, interest on back pay, and compensation for special damages sustained as a result of the retaliation, including litigation costs and attorney fees.

**REQUEST FOR RELIEF**

Relator, on behalf of herself and the United States, respectfully demands and prays that

judgment be entered against the Defendants, jointly and severally, as follows:

1. For the maximum amount of treble damages and civil penalties to be awarded to
   the United States under the False Claims Act;

2. For Relator to receive the maximum share allowed under 31 U.S.C. § 3730(d) of
   the False Claims Act;

3. For Relator to be awarded two times the amount of back pay, interest on back
   pay, and compensation for special damages sustained as a result of Crestwood's
   retaliatory termination of her employment;

4. For Relator to be awarded all costs and expenses of this action, including attorney
   fees, expenses, and costs as permitted by 31 U.S.C. § 3730(d) of the False Claims
   Act;

5. For all such other relief for Relator and the United States as may be just and
   proper.

**DEMAND FOR JURY TRIAL**

Relator, on behalf of herself and the United States, hereby demands a jury trial on all

claims alleged herein.

DATED this 3rd day of September 2020.

CLYDE SNOW & SESSIONS

*/s/ Christopher B. Snow*
Christopher B. Snow
Shaunda L. McNeill
*Attorneys for Relator*